**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF NEW MEXICO**

CARLOS ZUNIGA,

Plaintiff,

v. Case No. 1:25-cv-00535-KWR-JMR

WEXFORD HEALTH SOURCES, INC., *et al.*,

Defendants.

**MEMORANDUM OPINION AND ORDER DENYING DEFENDANTS' MOTION TO DISMISS**

**THIS MATTER** comes before the Court on Defendants Ronald Martinez, Wence Asonganyi, and Alisha Tafoya Lucero's Motion to Dismiss (Doc. 23). The Court finds that Plaintiff alleges sufficient facts to support his claims against Defendants Martinez, Asonganyi, and Lucero at this stage. The allegations demonstrate that they either knew of Plaintiff's obvious need for medical care and failed to act, or they knew of a pattern and practice that created a substantial risk of serious harm to inmates and failed to take steps to correct it. Given that law had clearly established that such conduct was a violation at the time of the allegations, Defendants are not entitled to qualified immunity. The Court will not partially strike the Amended Complaint since doing so will unnecessarily complicate and delay this proceeding. Having reviewed the parties' pleadings, exhibits, and the relevant law, the Court finds that the motion is not well-taken, and therefore, is **DENIED**.

**BACKGROUND**[1]

[1] The following allegations are taken from Plaintiff's Amended Complaint ("FAC") (Doc. 8) and his related state court complaint (Doc. 23-1).

**I. Plaintiff's back pain and undiagnosed spinal osteomyelitis.**

In May 2022, Carlos Zuniga ("Plaintiff") began experiencing back pain during his incarceration. Doc. 8 ¶ 30 (Amended Complaint). The following day, Plaintiff noticed a "visible knot on his spine." *Id.* ¶ 31. Correctional officers told him to submit a sick call slip, but none were available. *Id.* Plaintiff was "eventually given [an] over-the-counter pain reliever and [a] muscle rub." *Id.* ¶ 32.

In late May 2022, Plaintiff "voiced his need for medical attention to virtually every staff member he encountered." *Id.* ¶ 36. He was told to put in a sick call slip and wait to be seen, but he did not receive care. *Id.* ¶ 37. Plaintiff consistently described his pain in severe terms explaining that it felt like his spine "was being 'crushed' or 'ripped out.'" *Id.* ¶ 38. However, Plaintiff's medical chart does not capture his sick call requests or verbal complaints. *Id.* ¶ 39.

On June 22, 2022, Plaintiff was transported to medical in a wheelchair. *Id.* ¶ 40. Plaintiff was eventually examined by Nurse Practitioner ("NP") Lillian Klinger who prescribed "a one-time shot of Toradol, ongoing NSAIDs to be taken as needed, and x-ray imaging of the spine." *Id.* ¶ 41. This order for x-rays was not completed that day. Doc. 23-1 at 6 (State Complaint).

On June 23, 2022, Plaintiff submitted another request form explaining that the pain returned, he could barely walk, and he was experiencing severe spasms. Doc. 8 ¶ 43. Plaintiff was "seen by Manrique on Friday," June 24, 2022.[2] Plaintiff was prescribed pain medication for the weekend and instructed to see NP Klinger on Monday. *Id.* ¶ 44.

---

[2] Plaintiff's Amended Complaint states that he was seen by Manrique on July 24, 2022. *Id.* ¶ 44. However, the corresponding state complaint alleges he was seen June 24, 2022. Doc. 23-1 at 6. Given that the following allegations explain that he returned for treatment the following Monday "June 27, 2022," the Court presumes that June 24, 2022, is the proper date. *See* Doc. 8 ¶ 44–46.

On June 27, 2022, Plaintiff appears to have seen NP Klinger again, and she administered a corticosteroid shot, prescribed Decadron and Cyclobenzaprine, ordered bloodwork, and ordered additional x-rays to the pending order. *See id.* ¶¶ 45–46, 50; Doc. 23-1 at 7. At some point, "x-rays were finally taken" and the x-ray technician "recognized the urgency of his condition." Doc. 8 ¶ 48. NP Klinger exempted Plaintiff from work for two days "[r]ecognizing the severity of his condition." *Id.* ¶ 49. There is no record of the results of the bloodwork ordered by NP Klinger. *Id.* ¶ 50.

On June 30, 2022, an unknown medical provider, prescribed Plaintiff Lyrica and a Toradol shot. *Id.* ¶ 52. At an unspecified time, a medical provider—who Plaintiff believes to be Dr. Andrade—examined him for "poke marks," and ordered urinalysis and blood work. *Id.* ¶ 53.

Later, on June 30, 2022, Plaintiff was transported to Memorial Medical Center ("MMC"). This transport was initiated by an education staff member, Monica Rosales, apparently while the Warden, Deputy Warden, and unit manager were offsite. *Id.* ¶ 57. Plaintiff's full medical records did not make it to MCC, and MCC did not have his history of intravenous drug use and chronic Hepatitis C which were "needed to appropriately consider spinal osteomyelitis" as a diagnosis. *Id.* ¶ 59. At MMC, Plaintiff underwent a CT scan and was discharged with instructions to see his primary care provider "for further evaluation of the symptoms" and to return immediately for re-evaluation if "symptoms persist or worsen." *Id.* ¶ 64.

Upon discharge, Dr. Andrade was notified of Plaintiff's return and received all appropriate paperwork. *Id.* ¶ 65. Defendant Wence Asonganyi, Health Services Administrator, reviewed Plaintiff's hospital records, lab work, and discharge paperwork. *Id.* ¶ 66. But despite review, no plan was in place for Plaintiff to receive further evaluation. *Id.* Defendant Warden Ronald Martinez was aware of Plaintiff's return from MMC, and despite his knowledge of staffing shortages that

would cause an inability to provide Plaintiff's follow up care, Defendant Warden did not report or elevate the problem. *Id.* ¶ 67. However, a July 1, 2022 note by PA-NP Manrique indicates that Plaintiff had tenderness in the thoracic spine area, and the note calls for Plaintiff to "return to clinic as needed." *Id.* ¶ 72. On July 18, 2022, Plaintiff was seen "in medical for a follow-up for lower back pain and was diagnosed with acute to chronic thoracic nerve neuritis." Doc. 23-1 at 8. He was prescribed Depo-Medrol. *Id.*

On July 28, 2022, Plaintiff was released from custody and went to University of New Mexico Hospital ("UNMH") for treatment. *Id.* at 9. UNMH performed an x-ray but did not perform an MRI. *Id.* Plaintiff returned to UNMH on August 11, 2022, with worsening symptoms and received an MRI. *Id.* On August 12, 2022, Plaintiff underwent a CT and biopsy of the paravertebral soft tissue. *Id.* On August 25, 2022, Plaintiff returned to the emergency department at UNMH with bilateral lower extremity numbness, weakness, and an inability to walk. *Id.* at 10. Further x-rays, a CT scan, and an MRI revealed that Plaintiff had spinal cord compression, and immediate surgery was recommended. *Id.* On August 22, 2022, Plaintiff underwent spinal surgery. *Id.* He was discharged from UNMH on September 17, 2022, and he was required to wear a full body brace for over 6 months. *Id.* Plaintiff "has been left with permanent injuries, chronic pain, and significant physical limitations." Doc. 8 ¶ 76.

**II. <u>Plaintiff's untreated Hepatitis C.</u>**

Plaintiff was diagnosed with Hepatitis C Virus ("HCV") in 2017 while in NMCD custody. *Id.* ¶ 77. On August 25, 2021, Plaintiff requested HCV treatment. *Id.* ¶ 82. October 14, 2021 bloodwork "indicated high bilirubin, suggesting liver disease." *Id.* ¶ 84. On October 18, 2021, NP Klinger signed off on the results but took no action for a follow up. *Id.* ¶ 85. On November 8, 2021, Plaintiff filled out a health services request form requesting HCV treatment. *Id.* ¶ 86. Once Plaintiff

saw a provider, lab results indicated a "high HCV RNA viral load of 617,590 IU/mL." *Id.* ¶ 88. "Andrade signed off on these results on December 6, 2021, but took no action to arrange treatment for [Plaintiff]." *Id.* ¶ 90.

An HCV lab order appeared on Plaintiff's chart in February 2022, but the order form indicates that Plaintiff refused care—which Plaintiff deems "highly unlikely." *Id.* ¶¶ 92–94. May 2022 lab work revealed "abnormally high levels of liver enzymes ALT and AST, suggesting liver cell damage." *Id.* ¶ 95. Just before Plaintiff's release, Andrade noted that Plaintiff "needs to get treatment upon release," but provided no explanation for Wexford's failure to provide Plaintiff with treatment while in custody. *Id.* ¶ 97.

## III. Medical understaffing.

Plaintiff alleges that SNMCF's medical unit was critically understaffed and, at times, operated with only three nurses to serve more than 800 incarcerated individuals. *Id.* ¶ 98. Given these shortages, sick call slips were not processed for months, medical orders were not processed, and Plaintiff faced prolonged delays. *Id.* ¶ 100.

Plaintiff alleges that Defendant Warden knew of this severe shortage of medical staff and personally observed the HSA dealing with patients alone or practically alone on at least one occasion. *Id.* ¶ 105. These conditions directly contributed to Plaintiff's lack of treatment, monitoring, and follow up concerning his spinal infection and HCV. *Id.* ¶¶ 105–07.

## IV. Wexford's policies, practices, and customs.

Plaintiff alleges that Wexford's corporate model "prioritizes cost-containment over patient care, creating predictable and persistent constitutional violations across NMCD facilities." *Id.* ¶ 110. Wexford had been aware of a substantial risk of harm given "cancelled contracts, litigation, audits, and federal oversight in other jurisdictions." *Id.*

In an attempt to win a contract with NMCD in 2019, Wexford referenced its Illinois Department of Corrections ("IDOC") plan which saved costs in part due to its ability to contain offsite care costs. *Id.* ¶ 113. However, Wexford's performance at IDOC became the subject of the class action in which "experts found widespread systemic failures," and Wexford agreed to a consent decree that required "broad reforms that effectively repudiate[d] the very offsite cost-containment practices Wexford had touted to NMCD." *Id.* This lawsuit identified Wexford's "collegial review" process which led to "delays in identifying when offsite care was needed, delays in obtaining offsite paperwork, and a complete absence of timely follow-up once patients returned from outside facilities." *Id.* ¶¶ 115–16. Several reports found that the use of collegial review at IDOC caused significant delays with "potential to cause harm." *Id.* ¶¶ 117–18. Despite these reports, Wexford "continued to employ collegial review and similar utilization management practices in" SNMCF while Plaintiff was incarcerated there. *Id.* ¶ 121. Further, staffing levels have caused contract cancellations, investigations, and lawsuits at several Wexford facilities, including SNMCF. *Id.* ¶ 123 n.5, n.6. Thus, the harm befalling incarcerated individuals like Plaintiff has not been isolated. *See id.* ¶ 128.

## V. Defendants' specific alleged failures.

Plaintiff alleges that several NMCD officials were deliberately indifferent and caused his injury. *See id.* ¶¶ 130–50.

### A. Defendant Warden Martinez.

Plaintiff alleges that Defendant Ronald Martinez ("Defendant Warden Martinez"), Warden of SNMCF, was aware that staffing shortages and the medical needs of inmates were largely unaddressed. *Id.* ¶¶ 196–97. Defendant Warden Martinez had surveillance footage from every unit playing in his office. *Id.* ¶ 198. He "personally witnessed [Plaintiff's] decline beginning in [May

2022], when [Plaintiff] progressively lost the ability to walk, when [Plaintiff] required help from his fellow prisoners with tasks of daily living, and when [he] could not sleep in his bed for months but instead slept sitting upright against the wall." *Id.* ¶ 199. Further, Defendant Warden Martinez knowingly endorsed and perpetuated the unavailability of sick call forms which made inmates unable to make their medical problems known to staff. *Id.* ¶ 206.

**B. Defendant Asonganyi.**

Defendant Wence Asonganyi ("Defendant Asonganyi"), Health Service Administrator, oversaw "compliance by Wexford with NMCD policies," monitored "facility staffing levels," reviewed daily hospital reports, made final determinations about off-site referrals, and ensured appropriate care plans were implemented upon return. *Id.* ¶ 7. Plaintiff alleges that Defendant Asonganyi "personally reviewed the discharge paperwork from [MMC] following [Plaintiff's] June 30, 2022 hospitalization." *Id.* ¶ 132. The discharge paperwork instructed that Plaintiff receive a follow-up evaluation and return if his symptoms persisted or worsened, but he took no action to verify that this plan was implemented. *Id.* Furthermore, Defendant Asonganyi reviewed "paybacks," financial penalties NMCD assesses against its medical contractor for "failing to meet staffing and other contractual requirements." *Id.* ¶ 133. These paybacks reflected dangerously low staffing levels in 2022. *Id.* Despite the staffing levels revealed by the paybacks, Defendant Asonganyi took no corrective action. *Id.* Plaintiff alleges that Defendant Asonganyi participated in and enforced the collegial review system that delayed inmates' abilities to obtain outside medical referrals. *Id.* ¶ 134.

**C. Defendant Lucero.**

Plaintiff alleges that Defendant Lucero was required to exercise her general supervisory power over all department employees and take administrative action to ensure legal compliance.

*Id.* ¶ 227. Defendant Lucero is responsible for ensuring that Wexford provides constitutionally adequate medical care, including ensuring that Wexford adequately trains, supervises, hires, and disciplines staff. *Id.* ¶ 228. But Defendant Lucero did not use her supervisory power to ensure that inmates' rights were not violated. *Id.* ¶ 230. She failed to supervise Defendant Asonganyi and failed to ensure that he took corrective action for staffing shortages. *Id.* ¶ 231. She also endorsed and perpetuated a policy in which inmates were unable to convey their medical problems because sick call forms were unavailable. *Id.* ¶ 232. Defendant Lucero was aware that nearly one-in-four correctional officer positions were vacant in 2022 but failed to take corrective action. *Id.* ¶ 236.

Defendant Lucero, despite knowing of Wexford's past failures to provide adequate care in New Mexico facilities and other states' facilities, renewed Wexford's contract in 2019 "without adding any meaningful oversight requirements or structural safeguards." *Id.* ¶ 149. At that time, Wexford cited its Illinois operation for its cost-effective model even though its Illinois operation was under federal court scrutiny. *Id.* ¶ 148.

## LEGAL STANDARDS

### I. <u>**Motion to dismiss.**</u>

Under Federal Rule of Civil Procedure ("Rule") 12(b)(6), the Court may dismiss a complaint for "failure to state claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). In considering a Rule 12(b)(6) motion, the Court must accept as true all well-pleaded factual allegations in the complaint, view those allegations in the light most favorable to the plaintiff, and draw all reasonable inferences in the plaintiff's favor. *See Smith v. United States*, 561 F.3d 1090, 1097 (10th Cir. 2009).

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S.

662, 678 (2009). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" *Id.*

**II. <u>Qualified immunity.</u>**

When the defense of qualified immunity is raised on a motion to dismiss, "plaintiffs must allege facts sufficient to show (assuming they are true) that the defendants plausibly violated their constitutional rights, and that those rights were clearly established at the time." *Robbins v. Oklahoma*, 519 F.3d 1242, 1249 (10th Cir. 2008). "This requires enough allegations to give the defendants notice of the theory under which their claim is made." *Id.* But "[t]his does not mean that complaints in cases subject to qualified immunity defenses must include all the factual allegations necessary to sustain a conclusion that defendant violated clearly established law." *Id.* (citation modified).

## DISCUSSION

Defendants argue that the Court should take judicial notice of Plaintiff's state court complaint and original complaint as they directly relate to this action. Doc. 23 at 2 n.2. Based on the allegations in those complaints and the Amended Complaint, Defendants argue that Plaintiff fails to allege facts demonstrating that a constitutional violation occurred, that they are entitled to qualified immunity, and alternatively, that the Court should strike Plaintiff's Amended Complaint. Doc. 23 at 12–22. Plaintiff contends that he alleged sufficient facts to support his claims, qualified immunity does not apply, and the Amended Complaint should not be stricken. Doc. 27 at 13–26. The Court addresses each issue in turn.

## I. <u>The Court takes judicial notice of Plaintiff's related state court complaint.</u>

Defendants request that the Court take judicial notice of Plaintiff's original complaint and state court complaint. *See* Doc. 23 at 2 n.3. Plaintiff does not dispute this request. The Court will consider the state court complaint, to the extent it provides different or contradictory allegations, but it will not consider the original complaint in this matter.

Federal Rule of Evidence 201(b) allows courts to judicially notice facts that "(1) are generally known within the trial court's territorial jurisdiction, or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." *Fuqua v. Santa Fe Cnty. Sheriff's Office*, 157 F.4th 1288, 1298 (10th Cir. 2025) (citation modified). Such facts are "judicially noticeable because they are not 'subject to reasonable dispute.'" *Id.* (quoting Fed. R. Evid. 201(b)). Upon taking judicial notice, a court may "accept a matter as proved without requiring the party to offer evidence of it." *Id.* (quoting *United States v. Estep*, 760 F.2d 1060, 1063 (10th Cir. 1985)).

Courts may take "judicial notice of court records in related proceedings." *Id.* (citing *Gee v. Pacheco*, 627 F.3d 1178, 1191 (10th Cir. 2010)); *see also Bruce v. City & Cnty. of Denver*, 57 F.4th 738, 741 n.3 (10th Cir. 2023) ("[A] federal court may take judicial notice of another court's publicly filed records if they have a direct relation to matters at issue."). However, courts "must take judicial notice if a party requests it and the court is supplied with the necessary information." *Fuqua*, 157 F.4th at 1298 (quoting Fed. R. Evid. 201 (c)(2)). "[F]acts subject to judicial notice may be considered in a Rule 12(b)(6) motion without converting the motion to dismiss into a motion for summary judgment." *Tal v. Hogan*, 453 F.3d 1244, 1264 n.24 (10th Cir. 2006).

Defendants request that the Court take judicial notice of Plaintiffs "companion state court complaint" filed in *Zuniga v. NMCD*, No. D-202-CV-2024-01375.[3] Doc. 23 at 2. Defendants have attached Plaintiff's state court complaint as an exhibit, *see* Doc. 23-1, and Plaintiff has not argued against its consideration, *se* Doc. 27. Given that Plaintiff's state court complaint directly relates to matters at issue here, the Court considers Plaintiff's factual allegations in his state court complaint alongside the allegations in his operative Amended Complaint. *See Morphew v. Chaffee Cnty.*, 172 F.4th 802, 824 n.22 (10th Cir. 2026) ("We deny as moot Mr. Morphew's motion to strike because we can take judicial notice of the June 2025 state indictment."). Accordingly, the Court takes judicial notice of Plaintiff's companion state court complaint.

## II. <u>The Court finds that Plaintiff sufficiently alleges constitutional violations.[4]</u>

Plaintiff claims that he sufficiently alleges facts to support deliberate indifference claims against Defendants Warden Martinez, Asonganyi, and Lucero. Doc. 27 at 13–26. Defendants argue

---

[3] Defendants also request that the Court consider allegations within the original complaint for the purposes of this Motion to Dismiss. *See* Doc. 23 at 2 n.3. However, the cases Defendants cite for the proposition that the Court need not accept Plaintiff's amended allegations to the extent that they contradict earlier allegations are not binding on this Court. *MS ex rel. Harris v. E.N.M. Mental Retardation Servs.*, No. CIV 2:13-0628 RB/GBW, 2016 WL 10720810, at *4 (D.N.M. Feb. 19, 2016) dealt with a plaintiff's proposed fourth amended complaint and a court's discretion to infer bad faith from a proposed amendment that directly contradicts allegations in the original pleading. In *Muller v. Culbertson*, the court relied on a New York district court case for the proposition that a court may accept the facts in the original complaint when a plaintiff "blatantly changes his statement of facts in order to respond to a defendant's motion to dismiss." No. CIV 09-500 JB/ACT, 2010 WL 11523533, at *6 (D.N.M. Apr. 27, 2010) (citing *Kant v. Columbia Univ.*, 2010 WL 807442, *7 (S.D.N.Y. Mar. 9, 2010)). Given that the Tenth Circuit recognizes that "[a]n amended complaint supersedes the original complaint and renders the original complaint of no legal effect," the Court declines to consider the original complaint in addition to the amended complaint and the state complaint. *See Franklin v. Kan. Dep't of Corr.*, 160 F. App'x 730, 734 (10th Cir. 2005) (citing *Miller v. Glanz*, 948 F.2d 1562, 1565 (10th Cir. 1991)).

[4] Plaintiff's reference to his failure to obtain HCV treatment does not rise to the level of deliberate indifference. None of the Defendants were allegedly told or had reason to be aware of a reason for Plaintiff needing treatment. Plaintiff also does not allege that failing to receive HCV treatment caused him sufficient injury. To satisfy the objective component, the alleged deprivation must be "sufficiently serious" to constitute a constitutional deprivation. *Self v. Crum*, 439 F.3d 1227, 1230

that they are entitled to qualified immunity, Plaintiff failed to allege sufficient facts to state a claim, and the pleading should be stricken. Doc. 23 at 21–22. The Court disagrees.

Deliberate indifference to "an inmate's serious medical needs violates the Eighth Amendment's prohibition on cruel and unusual punishment if it 'constitutes the unnecessary and wanton infliction of pain.'" *Est. of Hurtado ex rel. Hurtado v. Smith*, 119 F.4th 1233, 1236 (10th Cir. 2024) (citing *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)). A deliberate indifference claim must satisfy both an objective and subjective prong. *Id.* Under the objective prong, "the alleged deprivation must be 'sufficiently serious' and pose 'a substantial risk of serious harm.'" *Id.* (quoting *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)). The subjective prong requires that an official have a "sufficiently culpable state of mind." *Id.* (quoting *Farmer*, 511 U.S. at 834). In other words, the official must know of and disregard an excessive risk to inmate health or safety. *Tafoya v. Salazar*, 516 F.3d 912, 916 (10th Cir. 2008) (quoting *Farmer*, 511 U.S. at 837). An official's knowledge of a risk "need not be knowledge of a substantial risk to a particular inmate, or knowledge of the particular manner in which injury might occur." *Tafoya*, 516 F.3d at 916. However, the official "is not deliberately indifferent to that risk unless he is aware of and fails to take reasonable steps to alleviate that risk." *Id.* (citing *La Marca v. Turner*, 995 F.2d 1526, 1536 (11th Cir. 1993)).

A medical professional may be deliberately indifferent when she fails "to treat a serious medical condition properly." *Paugh v. Uintah County*, 47 F.4th 1139, 1154 (10th Cir. 2020). Such is the case when a medical professional "fails to treat a medical condition so obvious that even a

---

(10th Cir. 2006). Plaintiff only alleges signs "suggesting" liver disease or liver cell damage, but he does not actually allege that any he suffered any harm. The "substantial harm" may be based on an intermediate injury like pain while waiting, *Al-Turki v. Robinson*, 762 F.3d 1188, 1193 (10th Cir. 2014), or the "ultimate harm," *Mata v. Saiz*, 427 F.3d 745, 754 (10th Cir. 2005). Plaintiff neither alleges an intermediate nor ultimate injury arising from his lack of HCV treatment.

layman would recognize the condition," completely denies care although presented with recognizable symptoms which potentially create a medical emergency," or "responds to an obvious risk with treatment that is patently unreasonable." *Id.* (quoting *Self*, 439 F.3d at1232). But a medical professional is not deliberately indifferent when she negligently treats or diagnoses an inmate, even if the care would constitute malpractice. *Id.*

If a prison official is not a medical professional, the prison official may be liable as a "gatekeeper." *Id.* A prison official may be liable for preventing an inmate "from receiving treatment" or denying "him access to medical personnel capable of evaluating the need for treatment." *Id.* (quoting *Sealock*, 218 F.3d at 1211).

The allegations satisfy the objective prong. Plaintiff alleges that he suffered from "advanced spinal osteomyelitis, discitis, and epidural phlegmon compressing his spinal cord." Doc. 8 ¶ 74. Plaintiff required spinal fusion, decompression surgery, and antibiotic therapy. *Id.* ¶ 75. He is left with "permanent injuries, chronic pain, and significant physical limitations." *Id.* ¶ 76. However, Defendants dispute several aspects of the subjective prong.

**A. Defendant Warden Martinez.**

Defendant Warden Martinez contends that the allegations fail to demonstrate that he had actual knowledge. Doc. 23 at 16. Plaintiff argues that Defendant Warden Martinez personally observed Plaintiff's deterioration which exhibited obvious indicators of a substantial risk of harm, and he knew of the staffing shortages but did nothing to correct them. Doc. 27 at 16. The Court agrees.

Plaintiff alleges that Defendant Warden Martinez had surveillance footage playing in his office and "personally observed" when Plaintiff "progressively lost the ability to walk," when he required help from fellow inmates "with tasks of daily living," and when Plaintiff "slept sitting

upright against the wall." Doc. 8 ¶ 199. Defendant argues that Plaintiff does not allege that Defendant Warden Martinez "ever saw Plaintiff on his surveillance feed," or that an awareness of an inmate's physical limitations is an obvious indicator of a substantial risk of harm. Doc. 33 at 9. But, at this stage, the Court must resolve all reasonable inferences in favor of Plaintiff. *Diversey v. Schmidly*, 738 F.3d 1196, 1199 (10th Cir. 2013) (noting that, on a motion to dismiss, a court must "resolve all reasonable inferences in the plaintiff's favor"). Given the allegations that Defendant Warden Martinez had surveillance footage of these events available and he "personally observed" these events, as this is a motion to dismiss, the Court must draw the reasonable inference that Defendant Warden Martinez saw Plaintiff's deterioration.

Establishing that Defendant Warden Martinez was aware of these facts from which an inference could be drawn that a substantial risk of serious harm existed is only half the inquiry. Plaintiff must establish that Defendant Warden Martinez "actually drew the inference." *Paugh*, 47 F.4th at 1156. Actual knowledge may be demonstrated in the usual ways, such as an inference from circumstantial evidence. *Id.* A factfinder may conclude a prison official knew of a substantial risk if the risk is "'obvious' to the so-called 'reasonable man.'" *Id.* (citing *Quintana v. Santa Fe Cnty. Bd. of Comm'rs*, 973 F.3d 1022, 1030 (10th Cir. 2020)).

Here, Plaintiff's allegations sufficiently establish actual knowledge. The allegations specifically state that Defendant Warden Martinez personally observed Plaintiff "progressively" lose the ability to walk. Doc. 8 ¶ 199. Indeed, a mobility issue alone does not indicate an obvious serious internal injury, but observing the progression from normal mobility to losing the ability to walk over weeks reasonably implies "an actual internal injury" and makes the need for medical care more obvious. *See Quintana*, 973 F.3d at 1030 (noting that bloody vomit implies to a reasonable official an actual internal injury).

Further, Plaintiff alleges that Defendant Warden Martinez knew of staffing shortages because he observed "the HSA dealing with patients alone or practically alone and after hours on at least one occasion." Doc. 8 ¶ 105. Plaintiff also alleges that Defendant Warden Martinez "knew of operational breakdowns that left sick calls and medication orders unprocessed." *Id.* ¶ 202. He also knew of the use of the collegial review system that contributed to delayed referrals. *Id.* ¶ 203. As alleged, Defendant Warden Martinez was responsible for "daily operations, staff oversight, coordination of transport and security for inmates receiving outside medical care, grievance handling, and enforcement of NMCD policy." *Id.* ¶ 6. Given these responsibilities, it is reasonable to infer that Defendant Warden Martinez knew that these systemic deficiencies presented a substantial risk of harm to inmates through a delay in receiving medical referrals but took no corrective action. Although Defendants correctly point out that Plaintiff received care at various points throughout his incarcerations, *see* Doc. 33 at 5, this argument does not negate Plaintiff's allegations that the delay in receiving the referral contributed to his injury. *See Paugh*, 47 F.4th at 1155 (noting that the objective component may be based on a delay if the delay resulted in substantial harm). Accordingly, Plaintiff adequately alleges facts that demonstrate Defendant Warden Martinez was aware of Plaintiff's obvious need for medical attention, and he failed his gatekeeping role by not ensuring that staffing levels were sufficient to facilitate timely medical treatment.

**B. Defendant Asonganyi.**

Defendants contend that Plaintiff's allegations do not establish that Defendant Asonganyi knew of Plaintiff's specific medical condition, even if he knew of dangerously low staffing levels. Doc. 23 at 17. And Defendants argue that Plaintiff's own allegations refute any claim that Defendant Asonganyi failed to implement post-hospital care. *Id.* Plaintiff alleges that Defendant

Asonganyi knew of the substantial risk to Plaintiff from reading the hospital discharge form and knew of the general risk to the prison population from understaffing and delays in receiving outside referrals. Doc. 27 at 17, 20. The Court agrees.

Plaintiff alleges that Defendant Asonganyi "personally reviewed the discharge paperwork from Memorial Medical Center following" his June 30, 2022 hospitalization. Doc. 8 ¶ 132. The discharged paperwork called for Plaintiff to receive further evaluation and if "symptoms persist or worsen they need to return immediately for re-evaluation." *Id.* ¶ 64. The discharge paperwork's requirement that Plaintiff "return immediately" if any symptoms persist or worsen indicate the serious need for facilitating medical attention. *See Paugh*, 47 F.4th at 1160–61 (noting that discharge instructions and a worsening condition make the need for medical attention more obvious). Having personally reviewed the discharge paperwork, it is reasonable to infer that Defendant Asonganyi knew that Plaintiff was in obvious need for medical attention and that monitoring would need to be facilitated. However, based on the allegations, it appears that Plaintiff received a follow-up appointment on July 1, 2022, and exhibited tenderness in the thoracic spine area, elevated temperature, and elevated respiratory rate. Doc. 8 ¶ 72. But Plaintiff was not returned to MMC, and nothing was in place or facilitated to ensure that Plaintiff received further medical care based on these symptoms or further monitoring in case symptoms worsened.

Plaintiff's allegations that Defendant Asonganyi monitored staffing levels, was aware of the payback penalties for dangerously low staffing levels, and participated in the collegial review process demonstrate that Defendant Asonganyi knew of and facilitated a pattern and practice that created delays in medical treatment, which then created a substantial risk of serious harm to inmates like Plaintiff. *See Tafoya*, 516 F.3d at 916 ("The official's knowledge of the risk need not be knowledge of a substantial risk to a particular inmate, or knowledge of the particular manner in

which injury might occur."); *see also Farmer*, 511 U.S. at 843 (finding that the question is "whether prison officials, acting with deliberate indifference, exposed a prisoner to a sufficiently substantial risk of serious damage to his future health" (citation modified)). Defendant Asonganyi's review of payback penalties demonstrates that he knew medical staffing was failing to meet requirements and created delays. Further, Plaintiff alleges that Defendant Asonganyi perpetuated the unavailability of sick call forms and that those forms that were made available had no functioning system to ensure that the forms were transmitted to the medical staff. Doc. 8 ¶¶ 217–18. These allegations demonstrate that Defendant Asonganyi knew that the delays created by the pattern and practices created a substantial risk of harm for an inmate in need of outside medical care.

Defendants' argument that Plaintiff did receive medical care does not refute Plaintiff's allegations that the delays in care caused his injury. The Tenth Circuit has found that a "reasonable jury could infer that understaffing" led to delayed treatment. *See Burke v. Regalado*, 935 F.3d 960, 1000 (10th Cir. 2019). Plaintiff alleges that following his discharge from MMC, he had a follow-up on July 1, 2022, but then he was not seen again until July 18, 2022, while his symptoms worsened. Doc. 8 ¶ 72; Doc. 23-1 at 8. Plaintiff also alleges that his initial requests for medical attention and to obtain a sick call slip were delayed. *See* Doc. 8 ¶¶ 31, 37. A reasonable jury could infer that understaffing led to these delays. *See Burke*, 935 F.3d at 1000. Further, at this stage, a reasonable jury could also infer that the lack of an appropriate records-keeping system, as Plaintiff alleges, contributed to the delayed medical care.

Accordingly, the Court finds that Plaintiff pled adequate facts to support his claim that Defendant Asonganyi was deliberately indifferent and aware of the substantial risk of serious harm due to the facility's conditions.

**C. Defendant Lucero.**

Defendants argue that Plaintiff's claim against Defendant Lucero fails because there is no allegation that she had "actual knowledge of Plaintiff's condition." Doc. 23 at 18. Plaintiff argues that he sufficiently alleges that Defendant Lucero acted with deliberate indifference given her failure to address systemic deficiencies in medical care at NMCD prisons despite numerous forms of notice and her management responsibilities. Doc. 27 at 22–23. Given the low bar of the motion to dismiss stage, the Court agrees.

Plaintiff alleges that Defendant Lucero was aware of Wexford's pattern and practice of delaying or denying inmates requests for outside care, but despite this knowledge and the substantial health risks created by this practice, Defendant Lucero did nothing to correct it. Doc. 8 ¶¶ 146–50. Plaintiff alleges that several sources of information—including staffing data, other litigation, past performance, and financial incentive—demonstrate that Defendant Lucero knew that Wexford's cost-cutting practices created a substantial risk of serious harm to an inmate. *See id.* ¶¶ 113, 123 n.6, 124, 146–49. These allegations must demonstrate that Defendant Lucero knew about Wexford's practices and that the practices create a substantial risk of harm that an inmate would suffer serious harm.

Plaintiff alleges that Defendant Lucero had access to data demonstrating that Wexford routinely delayed or denied outside care requests. *Id.* ¶ 146. Additionally, Plaintiff alleges that Defendant Lucero presented on the statistics that nearly one-in-four correctional officer positions were vacant in 2022. *Id.* ¶ 235. However, despite this knowledge, Defendant Lucero took no corrective action and allowed SNMCF to operate at dangerously low staffing levels that left essential functions like accompanying inmates to offsite medical referrals unfulfilled. *Id.* ¶ 236.

At this stage, it would not be unreasonable to infer that understaffing caused delays in medical treatment. *See Burke*, 935 F.3d at 1000.

Further, Plaintiff alleges that Wexford's cost-saving measures resulting in harmful delays were not isolated and that there were other lawsuits in New Mexico. *Id.* ¶¶ 123 n.6, 128. Among the cited cases, there were at least two cases, filed in New Mexico during 2021, that alleged Wexford's failure to timely treat and diagnose a spinal cord infection and Hepatitis C led to a significant injury and pain. *Id.* ¶ 123 n.6. However, Plaintiff does not allege whether these lawsuits ever provided discovery that substantiated these allegations. Without more, it cannot be inferred that Defendant Lucero—due to her position—knew whether these allegations were substantiated. Plaintiff does not allege that either of these cases proceeded to discovery and yielded any evidence that supports the allegations. *See Tafoya*, 516 F.3d at 921 n.6 (noting that the discovery process had been completed in a prior case before a plaintiff's assault in the later case). While the failure to allege that discovery had been completed or allegations had been substantiated warrants weighing these allegations less heavily, the mere fact that several lawsuits had been filed alleging a delay in medical treatment creates some knowledge of the allegations concerning delayed treatment.

Plaintiff also alleges that Defendant Lucero had knowledge of the federal oversight due to constitutional violations in Wexford's implementation of their Illinois plan. Doc. 8 ¶ 124. Plaintiff claims that Wexford used its Illinois plan as evidence of cost saving to help secure its New Mexico contract and that the widely reported litigation resulting from the Illinois operations provided "constructive notice" that the cost-containment model produced dangerous deficiencies. *Id.* Absent from the Amended Complaint are any allegations that Defendant Lucero was aware of the

deficiencies found over the course of the Illinois litigation. Similarly, there are no allegations that Defendant Lucero was aware of the reports discussed in the Illinois litigation.

Given that the Plaintiff alleges that Defendant Lucero had access to data that demonstrated routine denials or delays in providing offsite referrals and she presented data on the severe understaffing, a jury may reasonably infer that Defendant Lucero was "actually aware of a constitutionally infirm condition." *See Tafoya*, 516 F.3d at 922. Data demonstrating routine delays and chronic understaffing poses an obvious threat to inmates who need prompt offsite medical treatment but must wait due to delays. Accordingly, at this stage, Plaintiff alleges facts that, when taken to be true, sufficiently state a claim for deliberate indifference due to the conditions of the facility.

**III. <u>The Court finds that clearly established law existed at the time of the allegations.</u>**

Defendants rest their argument on the lack of a constitutional violation being alleged, not the lack of clearly established law. *See* Doc. 23 at 21–22. Plaintiffs contend that they sufficiently alleged a constitutional violation and that the law was clearly established at the time of the violation. Doc. 27 at 23–25. The Court agrees.

Prior to 2022, the Tenth Circuit established that prison officials may be liable for failing to take steps to remedy a substantial risk of serious harm to inmates that he is aware of. *Tafoya*, 516 F.3d at 916 ("[E]ven if a prison official has knowledge of a substantial risk of serious harm to inmates, he is not deliberately indifferent to that risk unless he is aware of and fails to take reasonable steps to alleviate that risk."). In *Quintana*, the Tenth Circuit noted that allegations that other inmates have had the same problem, here, the delay in receiving off-site treatment, coupled with the minimal allegation that the problem existed beforehand is probative of a pattern and practice existing. 973 F.3d at 1034. The Supreme Court has made clear that the "question under

the Eighth Amendment is whether prison officials, acting with deliberate indifference, exposed a prisoner to a sufficiently substantial risk of serious damage to his future health, and it does not matter whether the risk comes form a single source or multiple sources, any more than it matters whether a prisoner faces an excessive risk of attack for reasons personal to him or because all prisoners in his situation face such a risk." *Farmer*, 511 U.S. at 843. *Farmer* established that prison officials may be deliberately indifferent to a practice or policy that creates a risk to all prisoners or a subset of prisoners. *Id.* Here, the allegations demonstrate that the policy and practice of delayed offsite referrals created a substantial risk of serious harm to inmates in need of offsite referrals. At the time of the alleged violation, the law was clearly established that prison officials may be held liable for failing to take reasonable steps to remedy a known pattern or practice that creates a substantial risk of serious harm. Accordingly, the Court finds that Defendants are not entitled to qualified immunity.

## IV. **The Court denies Defendants' motion to strike.**

Defendants alternatively argue that the Court should strike Plaintiff's Amended Complaint as portions provide brief-like paragraphs, "lengthy narratives," and "legal analysis." Doc. 23 at 22. Plaintiff argues that these portions provide necessary context, medical standards, and the legal framework which are properly part of the complaint. Doc. 27 at 26.

Under Rule 8(a), a complaint "must contain . . . a short and plain statement of the claim showing that the [plaintiff] is entitled to relief." Fed. R. Civ. P. 8(a)(2). Rule 12(f) provides that a court may strike from a pleading an "insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f). Generally, courts disfavor motions to strike, but the decision to strike is within the court's discretion. *See ACT, Inc. v. Worldwide Interactive Network, Inc.*, 46 F.4th 489, 499 (6th Cir. 2022); *Samaritan Ministries Int'l v. Kane*,

No. 1:23-cv-01091-MIS-SCY, 2024 WL 4680597, at *2 (D.N.M. Nov. 5, 2024). Striking a pleading or part of a pleading "is a drastic remedy," and "because a motion to strike may often be made as a dilatory tactic," they are generally disfavored. *Martinez v. Naranjo*, 328 F.R.D. 581, 591–92 (D.N.M. 2018); *see also* 5C *Wright & Miller's, Federal Practice & Procedure* § 1382, at 433–36 (3d. ed. 2004) ("Rule 12(f) motions to strike on any of these grounds are not favored, often being considered purely cosmetic or 'time wasters' . . . [T]here appears to be general judicial agreement, as reflected in the extensive case law on the subject, that they should be denied unless the challenged allegations have no possible relation or logical connection to the subject matter of the controversy.").

Defendants contend that part of the Amended Complaint should be stricken because it provides lengthy narratives and "read[s] like a legal brief, not a pleading." Doc. 23 at 22. Defendants do not argue that the lengthy portions have no relationship to any of the elements in Plaintiff's claims. Defendants do not argue that they are prejudiced by the legal arguments or narrative portions. The narrative portions may provide helpful background for a case, like this, with several different defendants and claims being made. Given that motions to strike are generally disfavored and Defendants' arguments are not particularly persuasive, the Court denies Defendants' Motion to Strike.

## CONCLUSION

In sum, the Court finds that, at this stage, Plaintiff has adequately pled facts to state a claim against Defendants Warden Martinez, Asonganyi, and Lucero. At the time of the alleged violation, law had clearly established the violation, and Defendants are not entitled to qualified immunity. Finally, the Court will deny Defendants' request to partially strike Plaintiff's Amended Complaint.

**IT IS THEREFORE ORDERED** that Defendants' Motion to Dismiss First Amended Complaint and for Qualified Immunity or Alternatively, Motion to Strike, and Supporting Memorandum (Doc. 23) is hereby **DENIED** for reasons described in this Memorandum Opinion and Order.

_______/S/________________________________
KEA W. RIGGS
UNITED STATES DISTRICT JUDGE